7NITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LINE CONSTRUCTION BENEFIT FUND, A HEALTH AND WELFARE FUND, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 07 C 950 ) |
| ALLIED ELECTRICAL CONTRACTORS, INC., A Tennessee Corporation, | ) Judge Rebecca R. Pallmeyer ) ) |
| Defendant. | ) ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Line Construction Benefit Fund, a Health and Welfare Fund ("Lineco" or "Fund") administers the coverage for medical and drug expenses incurred by certain union members employed by Defendant Allied Electrical Contractors, Inc. ("Allied"). Lineco brings suit under Sections 502(a)(3), (g)(2), and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(3), (g)(2), and § 1145, claiming that Allied owes Lineco delinquent contribution payments for the months of July, August, and December 2006, and January and February 2007.

Defendant moves to dismiss this action on grounds of Plaintiff's lack of standing. In the alternative, Defendant moves for partial summary judgment, arguing that it was not bound by the terms of the Collective Bargaining Agreement during all the time periods at issue, and Plaintiff moves for summary judgment in its favor on that issue. For the reasons stated below, this court grants Plaintiff's motion for summary judgment.

**FACTS**[1]

Plaintiff Lineco is a multiemployer employee benefits fund located in Illinois that receives contributions from employers pursuant to collective bargaining agreements negotiated between employers and unions. (Plaintiff's Complaint ("Pl.'s Compl.") ¶¶ 3, 4.) Lineco is administered in accordance with Section 302(c)(5) of the Labor Management Relations Act ("LMRA") as well as the Employee Retirement Income Security Act of 1974 ("ERISA"). (Def.'s 56.1 [27] ¶ 1.)

In 2005, the Southeastern Line Constructors Chapter of the National Electrical Contractors Association ("NECA") and the International Brotherhood of Electrical Workers, Local Union 474 ("IBEW/Local 474") entered into a collective bargaining agreement ("the CBA") detailing the terms under which the Lineco Fund receives contributions pursuant to the Trust Agreement that established the Fund. (Pl.'s 56.1 [42] ¶ 1; Def.'s Resp. [43] ¶ 1.) Specifically, the CBA requires employers to pay into the Lineco Fund the sum of $4.75 per hour for each hour worked for the Employer by all employees covered by the CBA. (Def.'s 56.1 [27] ¶ 6.) The CBA further provides that "[i]t shall apply to all firms who sign a Letter of Assent to be bound by the terms of this Agreement." (Def.'s 56.1 [27] ¶¶ 4-5.)

Defendant Allied Electrical Contractors, Inc. ("Allied") is a Tennessee corporation that provides electrical contracting services in Tennessee and on occasion in other states not specified by either party. (Def.'s 56.1 [27] ¶ 2; Eskridge Dep. 9:13-10:2, Amended Ex. C [48] to Pl.'s 56.1 [42].) Its President is Michael Eskridge, a Tennessee resident. (Def.'s 56.1 [27] ¶ 2; Eskridge Dep. 6:16-17, Amended Ex. C [48] to Pl.'s 56.1 [42].) Allied has been a member of the NECA since about

---

[1] The facts presented here are drawn from the parties' Local Rule 56.1 Statements: Defendant's Statement of Undisputed Facts in Support of its Motion for Partial Summary Judgment ("Def.'s 56.1 [27]"); Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Amended Motion for Summary Judgment and Plaintiff's Response to Defendant's Statement of Undisputed Facts ("Pl.'s 56.1 [42]"); Defendant's Response to Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Amended Motion for Summary Judgment ("Def.'s 56.1 Resp. [43]"); Plaintiff's Reply to Defendant's Response to Plaintiff's Statement of Undisputed Facts in Support of Plaintiff's Amended Motion for Summary Judgement ("Pl.'s Reply [45]").

November 2002. (Def.'s 56.1 [27] ¶¶ 2-3, Amended Ex. C [48] to Pl.'s 56.1 [42].) Allied's NECA Application for Membership, signed August 28, 2002, does not mention a collective bargaining agreement or a benefit plan, nor does it bind the applicant to the terms of either a collective bargaining agreement or a benefit plan agreement. (Def.'s 56.1 [27] ¶¶ 10-11; Pl.'s Resp. [42] ¶¶ 10-11.) In his deposition, however, Mr. Eskridge acknowledged the NECA's role in collective bargaining on behalf of its members; he stated, "when you're a member of NECA, NECA negotiates the contracts." (Eskridge Dep. 14:25-15:4, Amended Ex. C [48] to Pl.'s 56.1 [42].) In addition, the letter accompanying Defendant's application for membership in the NECA, signed and dated by Mr. Eskridge on August 28, 2002, stated that one of Defendant's goals in joining the NECA was to become involved in the negotiating committee. (Def.'s 56.1 [27] ¶¶ 8, 12; Letter Accompanying Defendant's Application for member, Ex. G. to Def.'s 56.1 [27].)

Around October 2006, Eskridge did attend a negotiation session between the National Electrical Contractor's Association ("NECA") and IBEW/Local 474, but was informed that his failure to sign a Letter of Assent to the CBA made him ineligible to participate in the negotiations.[2] (Def.'s 56.1 [27] ¶¶ 8-9.) Two months later, on December 7, 2006, Defendant did execute a Letter of Assent to be bound by the CBA. (Def.'s 56.1 [27] ¶ 7.) In that letter, Allied authorized the NECA to represent Allied in all collective bargaining matters and agreed "to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements." (Letter of Assent, Ex. E to Def.'s 56.1 [27]; Pl.'s Compl. ¶ 7.) Under the Letter's own terms, it became effective on December 7, 2006 and remains in effect until NECA and IBEW/Local 474 receive written notice of termination from Allied at least 150 days prior to the anniversary date of the current approved labor agreement. (Letter of Assent, Ex. E to Def.'s 56.1 [27].)

It is undisputed that Defendant did not submit contribution reports and payments to Lineco

---

[2] Neither party has provided the date on which this negotiation session occurred.

pursuant to the CBA for the months of July, August, and December 2006, nor for January and February 2007.[3] (Pl.'s 56.1 [42] ¶ 2; Def.'s Resp. [43] ¶ 2.) Defendant admits that it employed members of IBEW/Local 474 covered by the CBA before December 7, 2006, when Eskridge signed the Letter of Assent. (Eskridge Dep. 12:4-7, Amended Ex. C [48] to Pl.'s 56.1 [42].) Defendant further admits that it made monthly contribution payments to the Lineco fund before becoming a member of NECA. Defendant began making payments as early as 1993 and continued to do so through February 15, 2008, with the exception of July, August, and December 2006, and January and February 2007. (Pl.'s 56.1 [42] ¶ 7; Eskridge Dep. 23:2-7, Amended Ex. C [48] to Pl.'s 56.1 [42].) During 2006, Eskridge signed at least one of the contribution payment checks to Lineco, dated June 15, 2006. (Cancelled Check, Ex. C1-3 to Pl.'s 56.1 [42].) There is no evidence that Allied ever sought to withdraw from NECA prior to the filing of this lawsuit.[4] (Eskridge Dep. 18:21-10, Amended Ex. C [48] to Pl.'s 56.1 [42].)

Plaintiff alleges that, pursuant to the CBA and the Trust Agreement, Defendant owes the Lineco Fund a total of $138,605.25 in delinquent payments for July, August, and December 2006 and for January and February 2007. (Def.'s 56.1 Resp. [43] ¶ 3.) Plaintiff seeks summary judgment in its favor on those claims. Defendants contends that it does not owe payments for July, August, and December 2006 because it did not sign the Letter of Assent required by the CBA until December

---

[3]   The record is not clear as to whether Allied submitted contribution reports alone without payment, or nothing at all. Plaintiff has provided conflicting statements, at one point stating that the contribution reports were submitted without the corresponding payments, and later stating that Allied did not provide the contribution reports or the payments. (Plaintiff's Answers to Defendant's First Set of Interrogatories ¶ 5; Pl.'s 56.1[42] ¶ 2.)

[4]   The record is unclear on when Defendant communicated an intent to withdraw from the fund, if ever. According to Eskridge, Defendant only indicated an intent to withdraw "when it was discovered that we had not signed a letter of assent." (Eskridge Dep. 23:8-17, Amended Ex. C [48] to Pl.'s 56.1 [42].) Eskridge does not say when this fact first came to his attention, though it may have been when he was turned away from the negotiation session between NECA and IBEW/Local 474 in October 2006. In any event, Defendant has not produced any evidence of an intent to withdraw from the fund other than Defendant's sporadic missed payments in 2006 and early 2007.

7, 2006. (*Id.*) Defendant moves to dismiss the complaint on the ground that Plaintiff lacks standing and, in the alternative, for partial summary judgment as to whether Defendant owes contributions to the Lineco Fund for periods predating December 7, 2006.

## DISCUSSION

**I.   Standing**

Defendant Allied has moved to dismiss this action pursuant to FED. R. CIV. P. 12(b)(1), contending that as a health and welfare fund, Lineco lacks standing to bring suit under ERISA. Defendant argues that Plaintiff is not a fiduciary under ERISA and that this court must therefore dismiss the complaint for lack of subject matter jurisdiction. In ruling on a motion to dismiss for lack of standing, the court accepts the allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003).

Section 502(a)(3) of ERISA grants "a participant, beneficiary, or fiduciary" standing to enforce any ERISA provisions.[5]  29 U.S.C.A. § 1002(21)(A). In a separate subsection, it also states that "an

---

[5]   ERISA defines a "fiduciary" as follows:

Except as otherwise provided in subparagraph (B), a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated under section 1105(c)(1)(B) of this title. 29 U.S.C.A. § 1002(2

(continued...)

5

employee benefit plan may sue or be sued under this under this subchapter as an entity." 29 U.S.C. § 1132(d)(1). Finally, 29 U.S.C. § 1132(e)(1) states, "the district courts of the United States shall have exclusive jurisdiction of civil actions under this subchapter brought by the Secretary or by a participant, beneficiary, fiduciary . . . ." 29 U.S.C. § 1132(e)(1) .

Defendant contends that Plaintiff, a plan rather than a group of trustees, lacks standing to bring an action for unpaid contributions. Defendant's argument rests in part on a split in authority among the circuits as to whether a plan itself is a fiduciary within the meaning of ERISA. For example, the Sixth Circuit held that a plan has standing to bring a counterclaim for collection of unpaid contributions because "[t]he Plan, as a party before the court, necessarily includes those who must act for the Plan to administer it and to effectuate its policies." *Saramar Aluminum Co. v. Pension Plan for Employees of Aluminum Industry and Allied Indus. of Youngstown Ohio Metro. Area*, 782 F.2d 577, 581 (6th Cir.1986). By contrast, the Ninth Circuit distinguishes plans from their fiduciaries, reasoning that a fund cannot be a fiduciary of itself. *Local 159, 342, 343 & 444 v. Nor-Cal Plumbing, Inc.*, 185 F.3d 978, 981 (9th Cir. 1999). In *Nor-Cal Plumbing*, the court recognized that a trust fund "could qualify as a fiduciary of a separate ERISA plan so long as it exercises discretionary authority over the management or administration of the plan or its assets." *Id.* at 982. The trust fund in that case, however, did not have standing to sue because it was not a separate entity from the plan itself. *Id.* (noting that "the Trust Agreement and the Trust Funds' complaint treat them as one and the same"). The Second Circuit, similarly, employs a strict textualist approach, interpreting the language of the statute as not explicitly authorizing pension funds to assert a cause of action for breach of fiduciary duty and denying standing on that ground. *Pressroom Unions-Printers League Income Sec. Fund v. Continental Assur. Co.*, 700 F.2d 889, 891 (2d Cir. 1983) (denying pension fund standing to sue under ERISA for breach of fiduciary duty by defendant insurance companies that allegedly

---

[5](...continued)
1)(A).

6

charged excessive premium payments and fees to the fund).

Defendant argues that, while there is no explicit holding from the Seventh Circuit, a note in *Winstead v. J.C. Penney Co., Inc.*, 933 F.2d 576 (7th Cir. 1991) suggests that the Seventh Circuit would follow the lead of *Nor-Cal* and *Pressroom*. In *Winstead*, the trustees of one benefit plan sought a declaratory judgment that another plan was liable for certain medical expenses. Because the court found that "trustees of the . . . plan are indisputably ERISA fiduciaries," it did not have to address the issue of whether a plan itself could bring suit as a fiduciary under ERISA. *Id.* at 579. The court did, however, note the following in dictum:

> As a detail we note that, as far as appears, the cross-claim in [a related lawsuit] has been brought by the [defendant] plan itself, not by its trustees. An ERISA plan can sue and be sued, 29 U.S.C. § 1132(d)(1), but it is doubtful, as noted earlier, that it can sue under a provision that confers a right of action on a fiduciary.

*Id.* at 581. Citing this comment in *Winstead*, Defendant urges the court to adopt the Ninth and Second Circuits' approaches and deny standing to benefit funds, including Plaintiff here. (Defs.' Mem. at 2-3)

In other decisions, however, the Seventh Circuit has recognized a benefits plan's right to sue under ERISA for breach of fiduciary duty and to recover delinquent contributions. For example, in *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320 (7th Cir. 1983), the central issue was whether a defendant insurer was a fiduciary under ERISA where a pension plan's trustees had "turned over the assets of the pension plan to [defendant] to manage with full investment discretion, " but the court explicitly acknowledged that "the participants, the trustees, and the plan itself" all had standing to sue under 29 U.S.C. 1132(a)(2), (d)(1) for breach of fiduciary duty. *Id.* at 327 ("It is true . . . that ERISA confers on pension plans standing to sue for breach of fiduciary obligations under ERISA . . . ."). *Id.* at 326. And, in a post-*Winstead* decision, the Seventh Circuit explicitly recognized the standing of multiemployer plans to sue under ERISA for delinquent contributions. *See Central States, Southeast and Southwest Areas Pension Fund v. Schilli*

7

*Corporation,* 420 F.3d 663 (7th Cir. 2005). In *Central States*, a pension plan brought suit to vacate the decision by an arbitrator that defendant employer was not subject to withdrawal liability under the MPPAA. *Id.* at 670. In discussing who had standing to sue, the court recognized that "the MPPAA authorizes multiemployer plans to sue for delinquent contributions owed 'under the terms of the plan or under the terms of a collectively bargained agreement.'" (citing 29 U.S.C.A. § 1145 and 1132(d)(1).) *Id. See also Milwaukee Carpenter's Dist. Council Health Fund v. Philip Morris, Inc.*, 70 F. Supp. 2d 888 (E.D. Wis.1999) (holding that ERISA plan's trustees had standing to sue, but suggesting in passing that the plan itself would be no less a fiduciary than its trustees so long as it exercised "substantial control over the plan's own assets, management and administration").

At least one district court in this circuit has suggested that the proper plaintiffs in an action under ERISA for delinquent contribution payments are trustees or other designated administrators of a benefits plan, and not the plan itself. *See Laborers' Pension Fund v. Leopardo Const., Inc.*, 139 F.R.D. 634, 635-36 (N.D. Ill. 1991) (granting plaintiff pension funds leave to amend the complaint in an action for delinquent payments in order to name the fund administrator [the fund's actual fiduciary] as plaintiff.) Even in that case, however, the court did not rule on the issue of whether the plaintiff plans had standing to sue under ERISA and Section 301 of the Labor-Management Relations Act. *Id.* at 635. Rather, the plaintiffs on their own initiative filed leave to amend the complaint naming its trustees as plaintiffs, and the court granted the motion over defendant's objection that the court lacked subject matter jurisdiction to do so.

This court concludes that a pension plan has standing to sue for delinquent payments under ERISA. The court hereby denies Defendant's motion to dismiss on this ground is denied.

**II.     Summary Judgment**

    **A.     Defendant's Motion for Summary Judgment**

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the

movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The parties have filed cross-motions for summary judgment on the issue of whether Allied is obligated to make delinquent contribution fund payments. Plaintiff argues that the CBA bound Defendant to make monthly contributions to the Fund even before Defendant formally signed the Letter of Assent on December 7, 2006, and that Defendant is therefore delinquent for the months of July, August and December 2006 and for January and February 2007. In response, Defendant contends that it became bound by the terms of the CBA only after signing the Letter of Assent and thus had no obligation to make contributions to the Fund prior to December 7, 2006. For the reasons stated below, this court grants Plaintiff's motion for partial summary judgment, and denies Defendant's cross-motion for summary judgment.

Section 302(a) of the LMRA prohibits employers from making payments to representatives of employees unless the payments fall within narrow statutory exceptions. 29 U.S.C. § 186(a). One exception permits an employer to contribute to a trust fund established for the benefit of employees so long as the obligation to contribute is specified in a written agreement: Section 302(c)(5)(B) of the LMRA provides that an employer's obligation to make contributions to a multiemployer fund is unenforceable unless that obligation is imposed by a written agreement with the employer. 29 U.S.C. § 186(c)(5)(B). The agreement need not be signed to satisfy the "written agreement" requirement. It need only set forth "a detailed basis on which payments are to be made to a trust fund." *Id.*; *Bricklayers Local 21 of Ill. Apprenticeship & Training Program v. Banner Restoration*, 385 F.3d 761, 770 (7th Cir. 2004) (quoting *Brown v. C. Volante Corp.*, 194 F.3d 351, 355 (2d Cir.1999))

The CBA is a written agreement within the meaning of § 302(c)(5)(B), adequately detailing the terms of payment between employers and Plaintiff. (Def.'s 56.1 [27] Stmt. ¶¶ 5-6.) At issue is when Allied became bound by that agreement. In the Seventh Circuit, a party may be bound by an agreement satisfying § 302(c)(5)(B) in either of two ways–through express assent to be bound by the agreement's terms or through conduct manifesting such assent. *Bricklayers Local 21*, 385 F.3d at

9

766. Courts generally "require some sort of *signed* agreement with an employer evincing an intent by the employer either to contribute to the funds or to be bound by a written collective bargaining agreement that itself provides for contribution to the funds." *Moriarty, on Behalf of Trustees Local Union No. 727 v. Brust Funeral Home, Ltd.*, No. 95 C 333, 1995 WL 472771, at *5 (N.D. Ill. Aug. 8, 1995) (emphasis original); *cf. Bricklayers*, 385 F.3d at 770 (noting that even an expired agreement may be enough to satisfy 302(c)(5)(B) where conduct shows continued intent to be bound). A signed agreement is not an absolute requirement, however, and "an employer may adopt a collective bargaining agreement by its actions or by a course of conduct that demonstrates an intent to abide and be bound by the terms of such an agreement." *Advance Cast Stone Co. v. Bridge, Structural and Reinforcing Iron Workers*, No. 01 C 2758, 2002 WL 31163757, at * 6 (N.D. Ill. 2002) (citing *U.S. Can Company v. NLRB,* 984 F.2d 864, 870 (7th Cir.1993); *Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988)).

Intent to be bound may be inferred where the party signs or otherwise assents to be bound by a written agreement that references an outside agreement, such as a collective bargaining agreement, or that recites the terms of such an agreement. *See Gariup v. Birchler Ceiling & Interior Co.,* 777 F.2d 370, 375 (7th Cir. 1985) (holding that "any combination" of "a written trust agreement, written collective bargaining agreements detailing the amount to be contributed to the Fund . . ., a written and signed Assent of Participation form and a completed yet unsigned Acceptance of Working Agreement form" was sufficient to satisfy § 302(c)(5)(B)). Plaintiff argues that Defendant's membership in the NECA is enough by itself to bind Defendant to the terms of the CBA. (Pl.'s Mem. in Supp. of Its Mot. for Summ. J. [41] at 2.) Notably, however, Defendant's membership application to the NECA makes no mention of the CBA or any other benefit plan (Def.'s 56.1 [27] ¶¶ 10-11), nor has Plaintiff presented any other document or agreement signed by Defendant referencing the CBA or its terms. Because application for and acceptance of membership in the NECA does not require the applicant to assent to the terms of the CBA, the court is not persuaded that NECA membership

10

alone is sufficient to bind Plaintiff to the CBA.

A party's course of conduct may, nonetheless, manifest assent to a collective bargaining agreement in satisfaction of the terms of § 302(c)(5)(B). *Bricklayers*, 385 F.3d at 770-71; *Gariup*, 777 F.2d at 376. Factors courts have considered in determining whether an employer's conduct manifests an intent to be bound by a collective bargaining agreement include "the payment of union wages, the remission of union dues, the payment of fringe benefit contributions, the existence of other agreements evidencing assent and the submission of the employer to union jurisdiction, such as that created by grievance proceedings." *Bricklayers*, 385 F.3d at 769 (citing cases). In *Bricklayers*, the court noted the existence of an unsigned, written agreement detailing terms of fringe benefit contributions. Defendant had made monthly contributions over a period of seven years, submitting contribution reports that specifically referenced the terms of the collective bargaining agreement. 385 F.3d at 771. There circumstances were sufficient, in the Seventh Circuit's view, to bind the employer to the terms of the agreement. (*Id.*) Similarly, in *Advance Cast Stone*, the employer protested that it was not bound because it had never received or signed the Principal Agreement containing the full terms of the collective bargaining agreement. 2002 WL 31163757, at *6. It did sign a Short Form Agreement with the defendants that "neither referred to nor incorporated the Principal Agreement" and terminated that agreement before the time period at issue. *Id.* This court nonetheless concluded that the employer bound itself to the Principal Agreement through its course of conduct, namely by consistently performing under the Principal Agreement's terms, including terms not mentioned in the Short Form Agreement.

As noted by Defendant, courts have been reluctant to infer intent to be bound where an agreement is unsigned and where the employer has exhibited minimal or no conduct manifesting assent. *Id.* at n.8 (discussing cases); *see also Firesheets v. A.G. Bldg. Specialists, Inc.*, 134 F.3d 729 (5th Cir. 1998) (benefit fund contribution payments not sufficient to show intent to be bound where defendant's other actions were inconsistent with the existence of a collective bargaining agreement).

Allied's conduct here, however, evidences repeated compliance with the terms of the CBA beyond what would be considered a "minimal" manifestation of assent. Defendant's membership in the NECA has been continuous since 2002, and Defendant acknowledges that the NECA has authority to negotiate collective bargaining agreements with unions on Defendant's behalf. (Def.'s 56.1 [27] ¶ 3; Eskridge Dep. 14:25-15:4, Amended Ex. C [48] to Pl.'s 56.1 [42].) Most significantly, Defendant admits that it submitted monthly contribution reports and payments in accordance with the terms of the current CBA prior to signing the Letter of Assent in December 2006, with the unchallenged exceptions of July, August and December 2006. (Pl.'s 56.1 [42] ¶ 7; Eskridge Dep. 19:18-27:18, Amended Ex. C [48] to Pl.'s 56.1 [42].) Defendant's professed awareness of the CBA's terms and its compliance therewith through the repeated submission of contribution reports and payments to Plaintiff is sufficient to meet the standard articulated in *Bricklayers*. The CBA constitutes a "written agreement" within the meaning of 302(c)(5)(B), and Defendant's conduct in accordance with that agreement manifests assent to be bound. *Bricklayers*, 385 F.3d at 771-72. The court holds that Defendant was bound by the CBA before signing the Letter of Assent on December 7, 2007.

## CONCLUSION

Defendant's motion to dismiss and for summary judgment [25] is denied. Plaintiff's motions for partial summary judgment [30, 40] are granted.

ENTER:

Dated: November 25, 2008

_____
REBECCA R. PALLMEYER
United States District Judge

12